# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUAN A. PORTILLO,<br>CDCR #H-80425,<br><br>　　　　　　　　　　Plaintiff,<br><br>vs.<br><br>DAVE S. KHATRI, M.D.;<br>SUNIL WALIA, M.D.,<br><br>　　　　　　　　　　Defendants. | Civil No.　06-2760 BTM (CAB)<br><br>**ORDER:**<br><br>**1) DENYING PLAINTIFF'S MOTION TO FILE SUR-REPLY [Doc. No. 37];**<br><br>**AND**<br><br>**2) GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED.R.CIV.P. 56(c) [Doc. No. 22]** |

## I.

### PROCEDURAL BACKGROUND

Juan A. Portillo ("Plaintiff"), a state prisoner currently incarcerated at Centinela State Prison ("CEN"), proceeding pro se and *in forma pauperis*, has filed this civil rights action pursuant to 42 U.S.C. § 1983. In his Complaint, Plaintiff claims Dave Khatri, M.D., CEN's Chief Medical Officer, and Sunil Walia, M.D., a CEN doctor, denied him adequate medical care for his kidney stones in violation of the Eighth Amendment's Cruel and Unusual Punishments Clause. (Compl. at 2-7.)

Doctors Khatri and Walia ("Defendants") have filed a Motion for Summary Judgment pursuant to FED.R.CIV.P. 56 [Doc. No. 22]. In response, the Court notified Plaintiff of the requirements for opposing summary judgment pursuant to *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988) and *Rand v. Rowland*, 154 F.3d 952 (9th Cir. 1998) (en banc) [Doc. No. 23].[1] After being granted an extension of time [Doc. No. 30], Plaintiff filed an Opposition [Doc. No. 33], to which Defendants have filed a Reply [Doc. No. 34]. Plaintiff has also filed a Motion requesting leave to file a sur-reply [Doc. No. 37], which Defendants oppose [Doc. No. 38].

While this case was randomly referred to the Honorable Cathy A. Bencivengo pursuant to 28 U.S.C. § 636(b)(1)(B) for disposition, the Court has determined that a Report and Recommendation regarding the disposition of the pending Motions is not required. *See* S.D. CAL. CIVLR 72.3(a). The Court finds oral argument unnecessary pursuant to S.D. CAL. CIVLR 7.1.d.1. The Court hereby DENIES Plaintiff's request for leave to file a sur-reply and GRANTS Defendants' Motion for Summary Judgment pursuant to FED.R.CIV.P. 56(c) for the reasons set forth below.

## II.

### FACTUAL BACKGROUND

In his Complaint, Plaintiff claims to have first experienced sharp pain in both sides of his abdomen in January 2001, shortly after he arrived at CEN; however, several exhibits show complaints of abdominal pain, kidney stones and urological treatment dating back to 1998 or 1999. (*See* Compl. at 3, 15; Pl.'s Ex. B; *see also* Defs.' Notice of Lodgment in Supp. Of Summ. J., Decl. & Report of Danny L. Keiller, M.D., [hereafter "Defs.' Ex. 17"] ¶ 2 & "Defs.' Ex. 18" at 000048.) Specifically, Plaintiff alleges a CEN doctor named Mosely, who is not named as a defendant, examined him in the 'D' yard medical clinic, and thereafter ordered an IVP and

///

///

---

[1] *Klingele* and *Rand* require the district court to ensure that a pro se prisoner has been given "fair notice ... of the requirements and consequences of a summary judgment motion." *County of Los Angeles v. Beltran*, 514 F.3d 946, 952 (9th Cir. 2008) (citing *Rand*, 154 F.3d at 960-61).

KUB sometime in May through September 2001.[2] (Compl. at 3.) These radiological tests revealed intra-renal calcifications, *i.e.,* kidney stones or "bilateral nephrolithiasis," but no evidence of renal obstruction or hydronephrosis.[3] (Pl.'s Exs. A & B.) Plaintiff claims during the next year and a half, he continued to complain to medical staff about the "persist[ent] pain growing in [his] abdomen." (Compl. at 3.)

It is on June 27, 2003, that Plaintiff first mentions Dr. Walia, whom he alleges ordered another KUB. (*Id.*) This KUB revealed "multiple calcifications" overlying Plaintiff's left kidney, "particularly in the upper and mid portion" which the radiologist, J.M. Johnson, M.D. believed "probably represent[ed] intrarenal calculi." However, "no calcifications [we]re seen along the course of [Plaintiff's] ureter or in [his] pelvis." (Pl.'s Ex. C.) Plaintiff alleges that while Dr. Walia was "armed" with this information, he "never order[ed] any treatment to correct Plaintiff['s] kidney stone pain." (Compl. at 4.)

Walia, however, who was a Staff Physician and Surgeon at CEN from July 1997 through 2007, recalls providing Plaintiff with medical care on several occasions. (*See* Defs.' Lodgment in Supp. of Summ. J. [Doc. No. 22-3], Decl. of Sunil Walia, M.D. [hereafter Defs.' Ex. 1] ¶¶ 1, 5.) On January 20, 2003, Dr. Walia claims he treated Plaintiff's right drop foot, which was secondary to sciatic nerve injury caused by a gunshot wound, as well as his "chronic condition of renal nephrocalcinosis ... or bilateral kidney stones, which he had since 1997." (*Id.* ¶ 5.) Dr.

---

[2] According to Defendant Khatri, IVP and KUB are abbreviations for different radiological exams used to diagnose and evaluate kidney stones. (*See* Defs.' Notice of Lodgment in Supp. of Summ. J. [Doc. No. 22-3], Decl. of Dave S. Khatri, M.D. [hereafter "Defs.' Ex. 8"] at ¶ 9.) IVP is short for intravenous pyelography and KUB stands for an x-ray of the kidney, ureter and bladder. (*Id.*) Intravenous pyelography is a "radiographic visualization ... obtained after intravenous administration of a radiopaque medium which collects in and is excreted by the kidneys." *See* MERRIAM WEBSTER'S ON-LINE MEDICAL DICTIONARY, available at http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=intravenous%20pyelogram (last visited Dec. 19, 2008).

[3] Nephrolithiasis means the "presence of renal calculi," or kidney stones. *See* Stedman's Online Medical Dictionary, available at http://www.stedmans.com (last visited Dec. 19, 2008). "Hydronephrosis" is the "cystic distension of the kidney caused by the accumulation of urine in the renal pelvis as a result of obstruction to outflow and accompanied by atrophy of the kidney structure and cyst formation." *See* MERRIAM WEBSTER'S ON-LINE MEDICAL DICTIONARY, available at http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=hydronephrosis (last visited Dec. 19, 2008). "Hydro[nephro]sis is the term used to describe the situation when a stone is obstructing a kidney or ureter." (Defs.' Ex. 8 ¶ 8.)

1  Walia recalls prescribing Plaintiff medication and referring him to medical specialists on several
2  other occasions, but his review of Plaintiff's medical records reveal that he treated Plaintiff only
3  once for complaints based on kidney pain--January 30, 2003. (*Id.* ¶¶ 8, 10.)

4  On that day, Plaintiff presented with complaints of a callous on his drop foot caused by
5  his prosthesis, as well as "pain to his lumbar region" which Plaintiff claimed was intermittent
6  since 1997. (*Id.*; *see also* Defs.'s Ex. 2 "Outpatient Interdisciplinary Progress Notes.") Walia
7  examined Plaintiff and reviewed Plaintiff's records, which revealed that an IVP dated 5/29/01
8  showed "bilateral renal lithiasis," and nephrolithiasis which was "more marked on the left than
9  the right." However, Plaintiff's ureters were "normal in their course and configuration" and
10 there "was no evidence of hydronephrosis," therefore, a urological consult which followed
11 recommended only "expectant treatment." (Defs.' Ex. 2.) Because Plaintiff "appeared
12 anxious," but was "in no acute distress," Walia prescribed Tylenol for pain and ordered a
13 "CBC, Chem-25, urinalysis and a KUB, since his last work up was done" more than a year
14 prior.[4] (*Id.*; *see also* Defs.' Ex. 3.) Dr. Walia further arranged for a "urology follow-up" "so
15 KUB findings" could be reviewed by a urologist, and a further follow-up with Plaintiff in the
16 yard clinic "in one month" when his test results and urology could be discussed. (*Id.*; *see also*
17 Defs.' Ex. 4.)

18 According to Dr. Walia, Plaintiff's medical records show he was seen in the yard clinic
19 by other staff physicians in March and April 2003, and pursuant to Walia's referral, was
20 examined by a neurologist, Dr. Mosely, in May and June 2003. (Defs.' Ex. 1 ¶¶ 10-13; *see also*
21 Defs.' Ex. 5.) The KUB Dr. Walia ordered was completed on June 27, 2003–it showed
22 probable intrarenal calculi in Plaintiff's left kidney, but "no calcifications ... along the course
23 of [Plaintiff's] ureter or in [his] pelvis." (Defs.' Ex. 1 ¶ 14; Defs.' Ex. 6.) Another KUB,
24 ordered by Dr. Mosely on August 8, 2003 and completed on August 14, 2003, again showed
25 "several calcific deposits overlying the area of [Plaintiff's] left kidney and surrounding renal

26

---

27  [4] Dr. Walia also recalls "explaining to Plaintiff that [he] was prescribing Tylenol ... rather than
    Motrin because [he] wanted to limit [Plaintiff's] intake of Motrin, [because it] can lead to kidney
28  problems and gastritis." (Defs.' Ex. 1 ¶ 9.)

1    hilium" as well as in "the mid portion of [Plaintiff's] right kidney." (Defs.' Ex. 1 ¶ 16; Defs.'
2    Ex. 7.) However, "[n]o calcifications [we]re seen in the region of the ureters," and "[n]o
3    additional abnormalities we[re] observed." (Defs.' Ex. 7.)

4          Plaintiff next alleges that approximately one year later, on July 1, 2004, and after
5    "consistently complaining about the pain" in his abdomen to unspecified persons, he was sent
6    to Pioneers Memorial Hospital ("PMH") where a CT scan of his abdomen and pelvis confirmed
7    renal stones and "suspicion of gallstones." (*Id.*; *see also* Pl.'s Ex. D.) A new CT scan of
8    Plaintiff's kidneys showed "multiple bilateral renal calculi, the largest measuring 1 x 0.5 cm in
9    the left kidney," but still "no hydronephrosis or dilated ureter to suggest obstructive uropathy."
10   (Pl.'s Ex. D.) Plaintiff admits his "uropathy was not obstructive," but nevertheless claims
11   "there was blockage" which he attributes to "surrounding inflammatory within [his] kidney."
12   (Compl. at 4.) The radiological report to which Plaintiff refers, however, notes only that his
13   "appendix [wa]s borderline in size with surrounding inflammatory changes [which] could
14   reflect appendicitis," and that a "clinical correlation [wa]s necessary to exclude appendicitis."
15   (Pl.'s Ex. D.)

16         Plaintiff alleges "several more months of complaining about pain in [his] abdomen"
17   passed until on October 17, 2005, another doctor named Thornton ordered a renal ultrasound.
18   (*See* Compl. at 4.)[5] The radiology report dated the same day showed:

19   > ... the right kidney to measure 8.6 x 4.9 x 5.3 cm. A 7 mm stone
20   > with shadowing is seen in the mid renal area. The left kidney
21   > measures 9.3 x 4.8 x 5.5 cm. At least three stones with shadowing
>    are seen involving the upper mid and lower poles. No
>    hydronephrosis, or cysts, or masses are seen at this time.

22   (*See* Pl.'s Ex. E.) Plaintiff claims that "even though the radiology report was said to show no
23   hydronephrosis, [he] was still in sever[e] pain." (Compl. at 4.)

24         On or about November 9, 2005, Plaintiff submitted an CDC Form 602 inmate appeal "in
25   an attempt to get treatment to correct the <u>cause</u>" of his recurrent kidney stones. (*Id.* at 5

---

[5] During these months, Plaintiff does not specifically refer to, but attaches exhibits entitled "Physician's Progress Notes," "Interdisciplinary Progress Notes" and "Physician's Orders" which reveal Plaintiff was examined on at least six separate occasions in CEN's Urology Clinic: Dec. 9, 2004, March 11, 2005, April 14, 2005, April 26, 2005, May 2, 2005 and June 9, 2005. (*See* Pl.'s Ex. D.)

(emphasis original); *see also* Pl.'s Ex. H.)  In his CDC 602, Log No. CEN 05-1914, which Plaintiff attaches to his Complaint as Exhibit H, Plaintiff recounts his history of kidney stones and pain and admits having received several "IVPs, ultrasounds and kidney cat scan tests," at CEN as well as a urological consult.  Plaintiff's CDC 602 also claims, however, that "no treatment ha[d] ever been done" for his condition since 2000, and requests the "removal" of his stones.  (Pl.'s Ex. H at 37, 39.)  On December 6, 2005, Plaintiff's appeal was denied at the informal level of review because a review of his medical records and October 17, 2005 ultrasound revealed "multiple stones but no swelling of the kidneys, no blood in [his] urine," and normal labs and renal function.  (*Id*.)  The initial denial of Plaintiff's appeal was affirmed at both the first formal and second levels of review on February 2, 2006 and March 6, 2006, respectively.  (*Id.* at 40-42.)

On or about March 29, 2006, Plaintiff reported to CEN's Treatment and Triage Unit with complaints of left flank pain which were "consistent with the pain one suffers when a kidney stone is moving toward and through a ureter." (Defs.' Notice of Lodgment in Supp. of Summ. J. [Doc. No. 22-3], Decl. of Dave S. Khatri [hereafter "Defs.' Ex. 8"] ¶ 15.)

Plaintiff alleges Dr. Khatri, as the Chief Medical Officer, was aware of this and the fact that a urine test conducted on March 29, 2006 showed "+++Lg" which Plaintiff claims is a "medical marker for determining the amount of blood in [his] urine." (Compl. at 5; *see also* Pl.'s Ex. G.)  Plaintiff asserts that "once blood is detected in the urine" it suggests a blockage or partial blockage in uropathy "generating enormous amounts of pain." (Compl. at 5.)

In response, Dr. Khatri claims to have treated Plaintiff with intravenous fluids and injections of Demerol and Phenegan.  (*See* Defs.' Ex. 8 ¶ 15;  Defs.' Ex. 9.)  When Plaintiff returned to the Treatment and Triage Unit on the next day, March 30, 2006, with the same complaints, Dr. Khatri repeated his treatment of IV fluids, and re-injected Plaintiff with Demerol and Phenergan.  (*Id.* ¶ 16; *see also* Defs.' Ex. 10.)

When Plaintiff returned the third day, March 31, 2006, Dr. Khatri repeated his previous treatments, but further submitted forms he claims were required to authorize Plaintiff's transfer to the PMH Emergency Room.  (Defs.' Ex. 8 ¶ 17; *see also* Defs.' Ex. 11.)  According to Dr.

1 ///

2 Khatri, Plaintiff was transferred to PMH that same day "in order to obtain a second opinion and
3 so that Plaintiff could receive further treatment if necessary." (Defs.' Ex. 8 ¶ 17.)

4 At PMH, a CT scan of Plaintiff's abdomen and pelvis showed "left sided
5 hydronephrosis with a stone in the left ureter at the pelvic brim and a right ureteral stone S2
6 level with partial obstruction." (Defs.' Ex. 18 at 000049; Pl.'s Ex. G; Defs.' Ex. 8 ¶ 17; Defs.'
7 Exs. 11, 12; Compl. at 4-5.) However, "physicians at [PMH] did not make any further
8 recommendations and ... continued the same care [Khatri] had provided." (Defs.' Ex. 8 ¶ 17.)

9 On April 2, 2006, Plaintiff passed a stone spontaneously while being "treated with
10 narcotic analgesics." (*Id.* ¶ 18; Defs.' Ex. 18 at 000049.) Plaintiff provided Dr. Khatri with the
11 stone, which was submitted for laboratory analysis. (Defs.' Ex. 8 ¶ 18; Defs.' Ex. 13.)
12 According to Khatri, the results showed the stone was composed of calcium oxalate, which is
13 "common for kidney stones." (*Id.*) The next day, April 3, 2006, Khatri submitted a request that
14 Plaintiff be re-evaluated by a urologist. (Defs.' Ex. 8 ¶ 19; Defs.' Ex. 14.) On April 12, 2006,
15 Plaintiff was evaluated by Dr. Walther, another urologist. Dr. Walther noted Plaintiff had
16 recently passed a stone, conducted an ultrasound of Plaintiff's kidneys and noted that while
17 there remained multiple stones in Plaintiff's left kidney, there was "no appreciable
18 hydronephrosis" at the time. (*Id.*; Defs.' Ex. 15.)

19 On May 23, 2006, Plaintiff's CDC 602 Director's Level Appeal Decision was decided.
20 (*See* Pl.'s Ex. H at 35-36.) In the Director's Level Decision, N. Grannis, Chief of the CDCR's
21 Inmate Appeals Branch, noted that Plaintiff's appeal contended that he was not receiving
22 "proper medical treatment" for his kidney stones at CEN. Plaintiff's appeal was denied,
23 however, based on findings that Plaintiff's claims were "refuted by the medical records and
24 professional staff familiar with [Plaintiff's] medical history." (*Id.* at 35.) Grannis noted that
25 while Plaintiff was "unhappy with the doctor's decisions," the CDCR "only provides medical
26 services for inmates which are based on medical necessity and supported by outcome data as
27 effective medical care." (*Id.*) Grannis further noted that "it [wa]s inappropriate for [Plaintiff]

28

7 06cv2760

1  to recommend [h]is own treatment and expect his treating physician to implement his
2  recommendation without medical corroboration." (*Id.*)

3  On December 2, 2008, Plaintiff filed his civil rights complaint pursuant to 42 U.S.C.
4  § 1983 seeking no injunctive relief, but rather, general and punitive damages against Drs. Walia
5  and Khatri. Plaintiff claims Walia and Khatri violated his Eighth Amendment rights by acting
6  with deliberate indifference to his serious medical needs. Specifically, Plaintiff claims
7  Defendants' Walia and Khatri's refusals to "pass an endoscope into [his] bladder and ureter,"
8  perform "open abdominal surgery" or "break[] the stone[s] into smaller fragments with sound
9  waves" constituted cruel and unusual punishment. (*See* Compl. at 5-6, 10.)

## III.

### PLAINTIFF'S MOTION REQUESTING LEAVE TO FILE SUR-REPLY

12  As an initial matter, the Court turns to Plaintiff's Motion Requesting permission to file
13  a Reply to Defendants' Reply to his Opposition to Summary Judgment [Doc. No. 37].

14  Local Rule 7.1 of the Southern District of California governs motion practice. Unless
15  otherwise ordered, Rule 7.1, subdivision (3) provides only for the filing of a motion, an
16  opposition and a reply. *See* S.D.CAL. CIVLR 7.1(3)(1)-(3).

17  Here, Plaintiff requests leave to address "certain misrepresentations" made by
18  Defendants in their Reply which he claims were "clearly designed to mislead the Court, as well
19  as vil[l]ify Plaintiff and his claims." (Pl.'s Req. at 1.) Plaintiff does not further describe which
20  specific assertions he believes are misleading or "villifying." Moreover, Defendants oppose
21  his request to re-open briefing on the grounds that Plaintiff was given proper *Klingele/Rand*
22  notice at the time their Motion was filed, he was given a "full and fair opportunity to present
23  evidence and argument" in opposition to summary judgment, he did so, and their Reply "did
24  not contain any assertion of fact or law that were not contained in their [summary judgment]
25  papers." (Defs.' Opp'n at 2.)

26  The Court agrees. Defendants' Reply raises no new issues not already addressed in their
27  moving papers and Plaintiff's Opposition amply addresses the issues before the Court.
28  Accordingly, Plaintiff's request is DENIED.

/ / /

/ / /

## IV.

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**A.    FED.R.CIV.P. 56 Standard of Review**

Summary judgment is proper where there is no genuine issue of material fact in dispute and the moving party has shown it is entitled to judgment as a matter of law. *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing FED.R.CIV.P. 56(c)).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting FED.R.CIV.P. 56(c)); *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted).

If the moving party meets its initial responsibility, the burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324; *Bias*, 508 F.3d at 1218. To avoid summary judgment, the non-moving party is "required to present significant, probative evidence tending to support h[is] allegations," *Bias*, 508 F.3d at 1218 (citations omitted), and must point to some evidence in the record that demonstrates "a genuine issue of material fact [which], with all reasonable inferences made in the plaintiff[]'s favor, could convince a reasonable jury to find for the plaintiff[]." *Reese v. Jefferson School Dist. No. 14J*, 208 F.3d 736, 738 (9th Cir. 2000) (citing FED.R.CIV.P. 56; *Celotex*, 477 U.S. at 323); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The opposing party cannot rest solely on conclusory allegations of fact or law. *Berg v.*

*Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986). Instead, to demonstrate a genuine issue requiring trial, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 587 (citation omitted).

The evidence of the opposing party is to be believed. *See Anderson*, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. *See Matsushita*, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987).

Because it is relevant in this case, the Court also notes it "does not have a duty to search for evidence that would create a factual dispute." *Bias*, 508 F.3d at 1219 (citing *Carmen v. Unified School Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001)). In *Carmen*, the Ninth Circuit found it "unfair" to the require the district court to "examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the moving papers with adequate references so that it could be conveniently found." *Id.*; *see also Forsberg v. Pacific N.W. Bell Tel. Co.*, 840 F.2d 1409, 1417-18 (9th Cir. 1988) (district court is "not required to comb the record to find some reason to deny a motion for summary judgment"). This is true even where the non-moving party is proceeding in pro se. *See Bias*, 508 F.3d at 1219 (affirming summary judgment for defendants where pro so plaintiff "failed to present any evidence in opposition" and expressly rejecting pro se litigant's argument that the district court "should have searched the entire record to discover whether there was any evidence [to] support[] her claims" because she was proceeding without counsel). "A district court lacks the power to act as a party's lawyer, even for pro se litigants. *Bias*, 508 F.3d at 1219.

### B.   Defendants' Arguments

Defendants seek summary judgment on the following grounds: (1) Plaintiff's claims against Dr. Walia are barred by the statute of limitations, (Defs.' Mem. of P &As in Supp. of Summ. J. at 7); (2) he has failed to show they acted with deliberate indifference (*id.* at 7-10), and they are entitled to qualified immunity. (*Id.* at 10-11.) Plaintiff opposes, arguing his claims

against Dr. Walia are timely because Walia "had contact with Plaintiff as late as June 2006, (Pl.'s Opp'n at 7), that both Drs. Walia and Khatri's "failure to address" his chronic kidney stones is "callous[,]" "deliberate[]" and "wanton" and has caused him "unnecessary pain," as well as "physical and psychological injury" (*id.* at 10), and that they are therefore not entitled to qualified immunity. (*Id.* at 10-11.)

### 1. Statute of Limitations

Because section 1983 contains no specific statute of limitation, federal courts apply the forum state's statute of limitations for personal injury actions. *Lukovsky v. San Francisco*, 535 F.3d 1044, 1048 (9th Cir. 2008); *Jones v. Blanas*, 393 F.3d 918, 927 (9th Cir. 2004); *Maldonado v. Harris*, 370 F.3d 945, 954 (9th Cir. 2004); *Fink v. Shedler*, 192 F.3d 911, 914 (9th Cir. 1999). Until December 31, 2002, the applicable statute of limitations for a personal injury claim in California was one year. *See Jones*, 393 F.3d at 927 (citing CAL. CIV. PROC. CODE § 340(3) (West 2002)). Effective January 1, 2003, the applicable California statute of limitations was extended to two years. *Id.* (citing CAL. CIV. PROC. CODE. § 335.1 (West 2004)).

"Under the traditional rule of accrual ... the tort cause of action accrues, and the statute of limitation begins to run, when the wrongful act or omission results in damages." *Wallace v. Kato*, 595 U.S. 384, 127 S. Ct. 1091, 1097 (2007) (citation omitted). Unlike the length of the limitations period, "the accrual date of a § 1983 cause of action is a question of federal law that is not resolved by reference to state law." *Id.* at 1095. "Under federal law, a claim accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action." *Maldonado*, 370 F.3d at 955; *Fink*, 192 F.3d at 914; *Wilson v. Garcia*, 471 U.S. 261, 267 (1985). Thus, the statute of limitations begins to run when the plaintiff knows or has reason to know of the act providing the basis for his injury. *Maldonado*, 370 F.3d at 955; *see also Lukovsky v. City & County of San Francisco*, 535 F.3d 1044, 1048 (9th Cir. 2008). The cause of action accrues even though the full extent of the injury is not then known or predictable." *Wallace*, 127 S. Ct. at 1097. "Were it otherwise, the statute would begin to run only after a plaintiff became satisfied that he had been harmed enough, placing the supposed statute in repose in the sole hands of the party seeking relief." *Id.*

Defendant Walia argues Plaintiff's claim against him accrued in or sometime after June 27, 2003 when Plaintiff alleges Walia "ordered another KUB" but never "order[ed] any treatment to correct [his] kidney stone pain." (Compl. at 4-5; Defs.' P&As at 7.) In fact. Dr. Walia claims that because staff physicians at CEN in 2003 worked on a three-month yard rotation, he did not examine or have any contact again with Plaintiff until March 2004, although Plaintiff's medical records show he was treated by another yard physician, Dr. Thornton, referred to a urologist, Dr. Mosley, and underwent two radiological examinations during the course of 2003. (Walia Decl. ¶¶ 10-17.) Walia argues that because Plaintiff "does not allege any facts to suggest [he] treated Plaintiff, or even came into contact with Plaintiff, after June 2003," Plaintiff's claims against him are untimely. (*Id.*)

In opposition, Plaintiff also points to Dr. Walia's Declaration, in which he admits having treated Plaintiff again on March 7, 2004, when he "admitted Plaintiff into the infirmary" based on his complaints of chest pain. (*See* Pl.'s Opp'n at 7.) Plaintiff further attaches three exhibits–all excerpts of his prison medical records– which Plaintiff claims show Dr. Walia "had contact" with him on February 13, 2006, April 12, 2006, and as late as June 22, 2006. (*Id.*; *see also* Pl.'s Exs. A-C.) However, Plaintiff's Complaint does not allege any Eighth Amendment violations by Dr. Walia other than those arising either in January 2003–when Walia examined him– and in June 2003–when Plaintiff alleges the KUB Walia ordered revealed "multiple calcifications overlying [his] kidney," but Walia failed to "order any treatment." (Compl. at 4.)

Based on these allegations, the Court finds that Plaintiff's inadequate medical care claims against Dr. Walia arose on or about June 27, 2003–the date when Plaintiff alleges Dr. Walia became "armed" with information revealing "multiple calcifications overlying" Plaintiff's left kidney, but ordered no "treatment to correct" Plaintiff's pain. (Compl. at 3-4; Pl's Ex. C.) It was at this time Plaintiff "knew or had reason to know of the injury" which forms the basis of a deliberate indifference claim against Dr. Walia. *Maldonado*, 370 F.3d at 955; *Lukovsky*, 535 F.3d at 1048.

Accordingly, CAL. CIV. PROC. CODE § 335.1's limitations period began on or about June 27, 2003, and would have expired two years later, on or about June 27, 2005. *Maldonado*, 370

F.3d at 954-55. However, Plaintiff did not file this action until December 20, 2006. Accordingly, unless the statute of limitations is tolled, Plaintiff's claims against Dr. Walia are time-barred.

Federal courts also look to state law in order to determine whether it provides a basis for tolling the statute of limitations. *Wallace*, 127 S. Ct. at 1098-99; *Hardin v. Straub*, 490 U.S. 536, 538-39 (1989); *Jones*, 393 F.3d at 927 (in actions where the federal court borrows the state statute of limitation, the federal court should also borrow all applicable provisions for tolling the limitations period found in state law). Under CAL. CIV. PROC. CODE § 352.1, the limitations period is tolled for an additional "period of up to two years based on the disability of imprisonment," so long as Plaintiff was "'imprisoned on a criminal charge, or in execution under the sentence of a criminal court for a term of less than for life.'" *Jones*, 393 F.3d at 927 (citing CAL. CIV. PROC. CODE § 352.1(a)).[6] The tolling statute applies "if the disability existed at the time the cause of action accrued." *Elliot v. City of Union City*, 25 F.3d 800, 802 (9th Cir. 1996).

Thus, because Plaintiff's claims arose while he was a prisoner at CEN, he is entitled to an additional two years of statutory tolling, requiring his claims against Dr. Walia to be filed on or before June 27, 2007. As noted above, Plaintiff's Complaint was filed in December 2006. Therefore, Plaintiff's Eighth Amendment claims against Dr. Walia are timely and his Motion for Summary Judgment is DENIED on this ground.[7]

///

---

[6] While there is no evidence in the record before the Court which indicates the length of Plaintiff's prison term of commitment, the Ninth Circuit has noted that California courts have "read out of the statute the qualification that the period of incarceration must be 'for a term less than for life' in order for a prisoner to qualify for tolling." *Jones*, 393 F.3d at 927 n.5 (citing *Grasso v. McDonough Power Equipment, Inc.,* 264 Cal.App.2d 597, 70 Cal.Rptr. 458, 460-61 (1968); *Martinez v. Gomez*, 137 F.3d 1124, 1126 (9th Cir.1998) (recognizing the continuing vitality of *Grasso*)).

[7] In addition, the Ninth Circuit has specifically held that "the applicable statute of limitations must be tolled while a prisoner completes the mandatory exhaustion process" required by 42 U.S.C. § 1997e(a). *Brown v. Valoff*, 422 F.3d 926, 943 (9th Cir. 2005). The record before this Court shows that Plaintiff filed Inmate/Parolee CDC 602 Appeal, Log No. 05-1914 on November 9, 2005, alleging Eighth Amendment inadequate medical care claims related to the "proper" treatment for his kidney stones. *See* Compl. at 34-43, Ex. H. Plaintiff's appeal was denied at the Director's Level of Review on May 23, 2006. *Id.* at 35. Therefore, Plaintiff is also entitled to tolling from November 9, 2005 through May 23, 2006.

///

///

///

### 2.   **Eighth Amendment Inadequate Medical Treatment Claims**

Both Defendants Walia and Khatri argue that no genuine issues of material fact exist to show either of them acted with the deliberate indifference required to support an Eighth Amendment violation. In the alternative, they argue they are entitled to qualified immunity. (*See* Def.'s. P&A's at 7-11.)

### A.   **Standard of Review**

The Eighth Amendment prohibits punishment that involves the "unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)); *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004). The Eighth Amendment's cruel and unusual punishments clause is violated when prison officials are deliberately indifferent to a prisoner's serious medical needs. *Estelle*, 429 U.S. at 105. "Medical" needs include a prisoner's "physical, dental, and mental health." *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982); *Hunt v. Dental Dept.*, 865 F.2d 198, 200 (9th Cir. 1989).

To show "cruel and unusual" punishment under the Eighth Amendment, the prisoner must point to evidence in the record from which a trier of fact might reasonably conclude that Defendants' medical treatment placed Plaintiff at risk of "objectively, sufficiently serious" harm and that Defendants had a "sufficiently culpable state of mind" when they either provided or denied him medical care. *Wallis v. Baldwin*, 70 F.3d 1074, 1076 (9th Cir. 1995) (internal quotations omitted). Thus, there is both an objective and a subjective component to an actionable Eighth Amendment violation. *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002); *Toguchi*, 391 F.3d at 1057 ("To establish an Eighth Amendment violation, a prisoner 'must satisfy both the objective and subjective components of a two-part test.'") (quoting *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002)).

Although the "routine discomfort inherent in the prison setting" is inadequate to satisfy the objective prong of an Eighth Amendment inquiry, *see Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 1999), the objective component is generally satisfied so long as the prisoner alleges facts to show that his medical need is sufficiently "serious" such that the "failure to treat [that] condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Clement*, 298 F.3d at 904 (quotations omitted); *Lopez*, 203 F.3d at 1131-32; *see also Doty v. County of Lassen*, 37 F.3d 540, 546 (9th Cir. 1994) ("serious" medical conditions are those a reasonable doctor would think worthy of comment, those which significantly affect the prisoner's daily activities, and those which are chronic and accompanied by substantial pain).

However, the subjective component requires the prisoner to also allege facts which show that the officials had the culpable mental state, which is "'deliberate indifference' to a substantial risk of serious harm." *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998) (quoting *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)). "Deliberate indifference" is evidenced only when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837; *Toguchi*, 391 F.3d at 1057.

Inadequate treatment due to "mere medical malpractice" or even gross negligence, does not amount to a constitutional violation. *Estelle*, 429 U.S. at 106; *Hallett*, 296 F.3d at 744; *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990). In other words, an "official's failure to alleviate a significant risk that he should have perceived but did not, ... cannot ... be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838; *Toguchi*, 391 F.3d at 1057 ("If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk.") (brackets, footnote and citations omitted)). The Eighth Amendment proscribes only "the 'unnecessary and wanton infliction of pain,' [] includ[ing] those sanctions that are 'so totally without penological justification that it results in the gratuitous infliction of suffering.'" *Hoptowit*, 682 F.2d at 1246

(quoting *Gregg*, 428 U.S. at 173, 183). "This is not an easy test for [a] plaintiff[] to satisfy." *Hallett*, 296 F.3d at 745.

Moreover, a difference of opinion between medical professionals concerning the appropriate course of inmate treatment or care is not enough, by itself, to support a claim of deliberate indifference. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). Nor does a difference of opinion between the prisoner and his doctors constitute deliberate indifference. *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996). And, while deliberate indifference can be manifested if a doctor or prison guard intentionally denies or delays access to medical care or otherwise interferes with medical treatment already prescribed, *see Estelle*, 429 U.S. at 104-05, the delay must also lead to further injury or be somehow harmful. *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992) (noting that harm caused by delay need not necessarily be "substantial"), *overruled on other grounds, WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997); *Wood*, 900 F.2d at 1339-40; *see also Shapely v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985); *Hunt*, 865 F.2d at 200 ("[D]elay in providing a prisoner with dental treatment, standing alone, does not constitute an Eighth Amendment violation.").

### B.   Application to Plaintiff's Allegations

Here, the evidence in the record is sufficient to show the "objective" component of an Eighth Amendment inadequate medical treatment claim. *See Clement*, 298 F.3d at 904. Plaintiff claims to have been suffering from recurrent kidney stones since 2001, and to have suffered "inordinate amount[s] of pain and suffering for nearly 2½ years at CEN." (*See* Compl. at 6, Pl'.s Opp'n at 9.) Plaintiff's medical records and Defendants' Declarations provide ample evidentiary documentation which supports Plaintiff's allegations of recurrent pain, his need for both physical and radiological examinations to track the size and location of his kidney stones, various medications, intravenous treatments, urological consults and an eventual hospitalization. (*See* Defs.' Exs. 1-18.) This evidence is more than sufficient to show Plaintiff's medical needs were objectively "serious." *See Estelle*, 429 U.S. at 105; *Madrid v. Gomez*, 889 F. Supp. 1146, 1200-1201 (N.D. Cal. 1995) ("Serious medical needs" include

1   "diseases such as asthma, hypertension, epilepsy, diabetes, tuberculosis and lupus" as well as
2   impairments such as hearing loss, abdominal pains, fractures, *kidney stones*, etc.).

3   However, what the record before the Court does *not* show is any triable issue as to the
4   subjective component of an Eighth Amendment inadequate medical care claim against either
5   Dr. Walia or Dr. Khatri. *See Frost*, 152 F.3d at 1128; *Farmer*, 511 U.S. at 837. In order to
6   justify trial, Plaintiff must point to evidence in the record to show that either Dr. Walia or Dr.
7   Khatri were "deliberately indifferent" to his serious medical needs, *i.e*, that they knew, yet
8   consciously disregarded his pain or the need to provide him constitutionally adequate care. *See*
9   *McGuckin,* 974 F.2d at1060; *Toguchi*, 391 F.3d at 1057. This "subjective approach" focuses
10  only "on what a defendant's mental attitude actually was." *Farmer*, 511 U.S. at 839.

11  The record in this case is replete with evidence which shows that Plaintiff suffers from
12  a serious, painful and recurrent condition. (*See* Pl.'s Exs. A-G; Defs.' Ex. 1 ¶¶ 5-19; Ex. 8 ¶¶
13  4, 9-25; Ex. 18.) Defendants Walia and Khatri, however, have provided their own sworn
14  declarations summarizing the various physical examinations, radiological and other laboratory
15  testing, urological referrals, consults, and the prescribed course of Plaintiff's medications,
16  intravenous treatments and hospitalization they have provided in response to Plaintiff's needs
17  over the course of six years. (Defs.'s Exs. 1, 8.) They have further provided copies of
18  Plaintiff's Outpatient Interdisciplinary Progress Notes, their own and other Physician's Orders,
19  Consultant's Records, Radiological Reports, Emergency Room Admission Forms, copies of
20  Dr. Khatri's Authorization for Plaintiff's temporary release to a private hospital for a second
21  opinion and observation, an ultrasound report, and the testimony of a urological expert, Dr.
22  Keiller, (Defs.' Exs. 2-7, 9-18), all which show continued and consistent medical treatment in
23  response to Plaintiff's recurrent reports of pain.

24  Plaintiff's only response to this evidence is, essentially, is to disagree with Defendants
25  as to whether they were responsive *enough*–specifically, Plaintiff argues that Drs. Walia and
26  Khatri should have instead, on unspecified occasions, "pass[ed] an endoscope into [his] bladder
27  and ureter," performed "open abdominal surgery" or broken his stones into "smaller fragments
28  with sound waves." (Compl. at 5.) Plaintiff is not a doctor however, and he has failed to

provide the Court with any documentary evidence which supports his medical self-diagnosis. *See Jackson*, 90 F.3d at 332. Moreover, Plaintiff has failed to point to any evidence in the record which might reasonably contradict Dr. Khatri's claim that "[n]one of the urologists who have examined Plaintiff ... have recommended the surgical removal of [his] kidney stones or

/ / /

/ / /

the use of lithotripsy."[13] (Defs.' Ex. 8 ¶ 14.) Nor has he provided any evidence which might reasonably contradict the findings of Dr. Keiller, a urologist who reviewed Plaintiff's medical records and history of treatment at CEN at Defendants' behest. Specifically, Dr. Keiller concluded that "[i]t is not appropriate to do lithotripsy for scattered, multiple tiny stones in the kidney," and that "lithotripsy has much more potential to cause pain or damage," and in fact, his review of Plaintiff's records show that Plaintiff

> ... was seen multiple times over the last eight years by several different urologists. Urological and emergency room consultations have been requested in a timely fashion. None of urologists recommended surgical intervention or lithotripsy although lithotripsy was considered and rejected by Dr. Lowe and considered but not recommended by Dr. Mosely.

(Defs.' Ex. 18.) Dr. Keiller opines, based on his review of Plaintiff's records, that all Plaintiff's "urological medical care met the standard for care for urology." *Id.* Further, D. Keiller concludes that the "Centinela physicians who treated Plaintiff during this time period, specifically Drs. Walia and Khatri, also complied with the standard of care with respect to urological issues." (*Id.*)

Because this evidence is not contradicted anywhere in the record, the Court finds no genuine issues of material fact exists as to whether either Dr. Walia or Dr. Khatri acted with deliberate indifference to Plaintiff's serious medical needs. *Estelle*, 429 U.S. at 105. The only decision a reasonable fact finder could reach is that Defendants did not act with deliberate indifference. Accordingly, the Court GRANTS Defendants' Motion for Summary Judgment as to Plaintiff's Eighth Amendment claims pursuant to FED.R.CIV.P. 56.

---

[13] Lithotripsy is the "surgical removal of the [kidney] stone." Defs.' Ex. 8 ¶ 8. "Surgery or lithotripsy is not appropriate ... where the stone is progressing through the urinary system." *Id*.

### 3. Qualified Immunity

Finally, Defendants argue they are entitled to qualified immunity. (Defs.' P&A's at 10-11.) However, because the Court has found no triable issue of fact exists to show that Plaintiff's Eighth Amendment rights were violated by either Defendant, the Court need not reach any issues regarding qualified immunity. *See County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998) ("[T]he better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged the deprivation of a constitutional right at all."); *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").

## V.

### CONCLUSION AND ORDER

For all the reasons set forth above, the Court hereby:

1) DENIES Plaintiff's Motion to File a Sur-Reply [Doc. No. 37]; and

2) GRANTS Defendants' Motion for Summary Judgment pursuant to FED.R.CIV.P. 56(c) [Doc. No. 22].

The Clerk shall enter judgment for Defendants Walia and Khatri and shall close the file.

**IT IS SO ORDERED**.

DATED: January 13, 2009

Honorable Barry Ted Moskowitz
United States District Judge